17-1375-cv
*Giunta, et al. v. Dingman, et al.*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2017

(Argued: November 8, 2017    Decided: June 19, 2018)

Docket No. 17-1375-cv

RYAN GIUNTA, ERIK H. GORDON,
*Plaintiffs-Appellants,*

*v.*

JAMES T. DINGMAN, BAHAMEX LTD., OUT WEST HOSPITALITY LTD., ISLAND
SMOKE HOUSE LTD., THE TRAVELLER'S RESTAURANT LTD., 25 NORTH LTD.,

*Defendants-Appellees.*[*]

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

Before:

LEVAL, LIVINGSTON, AND CHIN, *Circuit Judges.*

---

[*]     The Clerk of Court is directed to amend the official caption to conform to the above.

Appeal from a judgment of the United States District Court for the Southern District of New York (Buchwald, *J.*), dismissing the action for lack of subject matter jurisdiction. The district court concluded that plaintiffs-appellants had failed to sufficiently allege a "domestic transaction" under section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"). As that was the only federal claim and diversity jurisdiction was lacking, the district court dismissed the case.

VACATED AND REMANDED.

FRANKLIN B. VELIE (Harry H. Rimm, *on the brief*),
Sullivan & Worcester LLP, New York, New York,
*for Plaintiffs-Appellants.*

Jeffrey A. Mitchell, Judith R. Cohen, Browne George
Ross LLP, New York, New York,
*for Defendants-Appellees.*

CHIN, *Circuit Judge*:

This is an appeal by plaintiffs-appellants Ryan Giunta and Erik H. Gordon from a judgment of the district court dismissing this action against defendants-appellees James T. Dingman, BahaMex Ltd., Out West Hospitality Ltd., Island Smoke House Ltd., the Traveller's Restaurant Ltd., and 25 North Ltd., for lack of subject matter jurisdiction. The district court concluded that

plaintiffs had not sufficiently alleged a "domestic transaction" under section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"). As that was the only federal claim and diversity jurisdiction was lacking, the district court dismissed the case. For the reasons set forth below, we vacate the judgment of dismissal and remand for further proceedings.

## BACKGROUND

### A. *The Facts*

For purposes of this appeal, the facts alleged in plaintiffs' first complaint and proposed second amended complaint (the "SAC") are assumed to be true.[1]

Gordon met defendant-appellee Dingman through Giunta, their mutual friend, in or around late 2011.[2] In April 2013, Dingman invited Gordon to visit him in the Bahamas where he showed him the Traveller's, a restaurant that was part of Dingman's hospitality venture and operated by his purported holding company, Out West Hospitality Ltd. ("OWH"). In November 2013, Dingman asked Gordon about investing in OWH.

---

[1] The district court treated the SAC as the "operative complaint." Sp. App. 4.
[2] Giunta is also a named plaintiff-appellant. His claims, however, do not involve the question presented on appeal as to whether there is a cognizable Exchange Act claim.

From around November 1 to November 22, 2013, Gordon and Dingman met regularly for lunch in Manhattan and had several phone calls initiated by Dingman that Gordon took in Manhattan. They also met at least once at Dingman's family home in Manhattan. These New York meetings and the telephone conversations which Gordon took in New York are collectively referred to in the SAC and in this opinion as the "November 2013 Communications." Dingman made various material misrepresentations to Gordon during the November 2013 Communications to induce him to invest in OWH and/or its purported subsidiaries. It was also during the November 2013 Communications that Gordon accepted Dingman's offer of a 50% equity stake in the venture in return for Gordon's investment of capital (the "Agreement").[3] The Agreement was not reduced to writing.

Dingman made the following misrepresentations during the November 2013 Communications: (i) OWH was the parent company and 100% owner of Traveller's and other purported subsidiaries; (ii) Dingman would issue shares of OWH to Gordon worth up to 50% of OWH's equity; (iii) Dingman had personally invested more than $600,000 in OWH; (iv) OWH and its purported

---

[3] The equity breakdown was going to be 45% for Gordon, 45% for Dingman, and 10% for Giunta for services rendered ("sweat equity").

subsidiaries were profitable; and (v) Gordon, Giunta, and Dingman were the only equity stakeholders in OWH.

Pursuant to the Agreement, on November 22, 2013, Gordon wired $100,000 from his personal bank account in New York to an account identified by Dingman. In an acknowledgment letter on OWH letterhead, Dingman stated: "This letter is to acknowledge the receipt of 3 wires in the total amount $100,000.00 USD made out to Traveller's Restaurant. [OWH] intends to use the funds to purchase material and general operations. The investment will represent a 10 percent stake in the holding company of Out west Hospitallity [sic]. We appreciate your support and investment in the holding company." App. 254.[4]

On December 17, 2013, Gordon wired another $150,000 from his personal bank account in New York to Dingman. Dingman sent Gordon a nearly identical acknowledgment letter on OWH letterhead that stated that the wire was "made out to Traveller's Restaurant," the funds were to be used for certain operations, and the "[t]he investment will represent a 10 percent stake in the holding company of Out west Hospitallity [sic]." App. 256. It further noted that

---

[4]     Although not alleged in the SAC, as Gordon explained in an affidavit, he received and read the letter in Manhattan.

on "January 15th the company [OWH] will issue shares that will represent a total investment of 250,000 USD."  App. 256.[5]

From around January 2014 through April 2014, Dingman and Gordon continued to meet regularly for lunch in Manhattan where Dingman repeated the misrepresentations from the November 2013 Communications. Dingman also made similar misrepresentations in emails, *e.g.*, in a March 27, 2014 email from Dingman to Gordon where Dingman confirmed that "Erik and I have partnered up in The Bahamas in a fifty/fifty partnership."  App. 258.

On March 7, 2014, at a lunch in California, Dingman asked Gordon to wire $18,000 to him as a personal loan.  Gordon did so from his New York bank account.  Dingman never repaid the loan, and told Gordon that the money would count toward Gordon's equity.  On or around March 12, 2014, Gordon wired an additional $75,000 as an investment in OWH to Dingman, again from his bank account in New York.

Gordon repeatedly requested financial records for OWH throughout early 2014, but never received them.  On September 9, 2014, Dingman sent a joint letter to all OWH investors informing them that all businesses had been closed.

---

[5]     This letter also was received and read by Gordon in Manhattan.

The letter also stated that Dingman was doing a capital call to raise additional funds that would dilute existing shares if the shareholders failed to invest more. The existence of other equity holders came as a surprise to Gordon given Dingman's previous representations that Dingman and Gordon shared in 50/50 equity of OWH. In the following weeks, Dingman ignored Gordon's phone calls and emails requesting operating and financial information and refused to return Gordon's investment.

### B.    *The Proceedings Below*

This action was originally commenced by fourteen American and Bahamian plaintiffs. Shortly after defendants filed a motion to dismiss for *forum non conveniens*, eleven plaintiffs voluntarily dismissed their claims, leaving only the two current American plaintiffs, Gordon and Giunta, and a company allegedly owned by Giunta.

After the other plaintiffs dismissed their claims, the court directed Gordon and Giunta to file an opposition to the motion to dismiss along with a proposed amended pleading. Gordon and Giunta submitted the SAC, which asserted subject matter jurisdiction on the basis of diversity of citizenship and

federal question jurisdiction arising from Gordon's section 10(b) claim -- the only remaining claim asserted under federal law.

At a February 16, 2017 hearing on the motion to dismiss, the district court directed the parties to file submissions addressing whether Gordon's section 10(b) claim was a cognizable "domestic" securities claim under *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010).

After considering the parties' submissions and the allegations set forth in the SAC, on March 29, 2017, the district court dismissed the case for lack of subject matter jurisdiction. The court concluded that diversity jurisdiction was lacking, and that Gordon had not sufficiently alleged a "domestic transaction," as required for a cognizable federal securities claim. Applying Rule 12(b)(6) standards to the sufficiency of the federal securities claim, the district court determined that the transaction was not domestic because Bahamian approval was required for shares to be issued to Gordon.[6] It reasoned that this "approval" was a condition precedent that had to be satisfied before Dingman and Gordon became "irrevocably bound" to effect the purchase and sale of the securities. The

---

[6]    Part III of Chapter 360 of the Bahamas Exchange Control Regulations provides that issuance of shares in a Bahamian company to a non-resident foreign national requires the approval of both the Bahamian Investments Board and the Central Bank of the Bahamas before shares may be issued.

district court therefore concluded that a sufficient domestic transaction had not been entered into at the time of the Agreement.[7]  Judgment was entered March 31, 2017.[8]  This appeal followed.

## DISCUSSION

### I.  Domestic Transaction

#### A.  *Applicable Law*

We review *de novo* a district court's dismissal of a complaint under Rule 12(b)(6), accepting all of the complaint's factual allegations as true and drawing all reasonable inferences in the plaintiffs' favor.  *Forest Park Pictures v. Universal Television Network, Inc.*, 683 F.3d 424, 429 (2d Cir. 2012).  The complaint must state a claim that is plausible on its face.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual

---

[7]  The district court pointed out that the SAC alleged that "Dingman stated to Gordon that his shares would be registered with the appropriate Bahamian authorities." SAC ¶ 24.

[8]  We note the district court erred in concluding that the court lacked subject matter jurisdiction.  *See Morrison*, 561 U.S. at 253-54.  A complaint which alleges a violation of section 10(b) is within the federal question jurisdiction conferred by 28 U.S.C. § 1331. However, if the allegations fail to assert the facts necessary to sustain a claim for relief, the proper disposition is to dismiss the case on the merits under Fed. R. Civ. P. 12(b)(6). This constitutes an adjudication of the claim on the merits, not a dismissal for lack of subject matter jurisdiction.

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Section 10(b) of the Exchange Act makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b).

In *Morrison*, the Supreme Court held that section 10(b) does not apply extraterritorially but only to "transactions in securities listed on domestic exchanges[ ] and *domestic transactions in other securities*." 561 U.S. at 267 (emphasis added). *Morrison* did not provide guidance as to what constitutes "domestic transactions in other securities." *Id*. In *Absolute Activist Value Master Fund Ltd. v. Ficeto*, however, we explained that "domestic transactions," are those involving securities in which (1) irrevocable liability is incurred in the United States, or (2) title passes within the United States. 677 F.3d 60, 62 (2d Cir. 2012).

With respect to the first category -- whether irrevocable liability is incurred in the United States -- we explained that "it is sufficient for a plaintiff to allege facts leading to the plausible inference that . . . the purchaser incurred

-10-

irrevocable liability within the United States to take and pay for a security, or that the seller incurred irrevocable liability within the United States to deliver a security." *Id.* at 68. Irrevocable liability, for section 10(b) purposes, attaches "when the parties become bound to effectuate the transaction," that is, when "the parties obligated themselves to perform what they had agreed to perform even if the formal performance of their agreement is to be after a lapse of time." *Id.* at 67-68 (quoting *Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 891 (2d Cir. 1972)); *see also Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.*, 753 F. Supp. 2d 166, 177 (S.D.N.Y. 2010) (holding that a purchase of securities is "domestic" if the purchaser "incur[s] an irrevocable liability to take and pay for the stock" in the United States (quoting *Blau v. Ogsbury*, 210 F.2d 426, 427 (2d Cir. 1954)).

To determine whether irrevocable liability was incurred within the United States, courts look to the terms, timing, and place of the parties' contracting and liabilities thereunder. *See Absolute Activist*, 677 F.3d at 68-69. Relevant "facts concerning the formation of the contracts, the placement of purchase orders, . . . or the exchange of money" should be considered. *Id.* at 70.

-11-

At the pleading stage, it is sufficient for the plaintiff "to allege facts leading to the plausible inference" of a domestic transaction. *Id.* at 68.

### B. *Application*

As OWH's shares were not listed on a domestic exchange, Gordon had to sufficiently allege that the Agreement involved a "domestic transaction," meaning that Gordon (the purchaser) incurred irrevocable liability within the United States to take and pay for a security or Dingman (the seller) incurred irrevocable liability within the United States to deliver a security. We conclude that the complaint plausibly alleged that (1) the Agreement was a contract, and thus Gordon and Dingman became obligated to take, pay for, and deliver a security when they were in the United States; and (2) this liability was irrevocable when they formed the Agreement, even though their obligations were subject to a condition subsequent. Because the Agreement was made in the United States, Gordon has adequately alleged a "domestic transaction" for purposes of the Exchange Act.

The SAC alleges that Dingman and Gordon agreed "that Gordon would invest capital in OWH and/or its subsidiaries in exchange for a fifty percent equity stake in OWH." App. 269; *see Express Indus. & Terminal Corp. v.*

*N.Y. State Dep't of Transp.*, 93 N.Y.2d 584, 589 (1999) ("Generally, courts look to basic elements of the offer and the acceptance to determine whether there is an objective meeting of the minds sufficient to give rise to a binding and enforceable contract."). Dingman's offer, as alleged in the SAC, was "sufficiently definite . . . such that its unequivocal acceptance" gave "rise to an enforceable contract." *Express Indus.*, 93 N.Y.2d at 589-90. Although the offer did not specify the total amount of money Gordon would invest, Gordon subsequently wired $100,000 to Dingman, and Dingman confirmed receipt of the funds and stated that the investment would represent a 10% stake in the company. This "subsequent conduct" -- following Gordon's transfer of funds -- makes the price of Gordon's investment "sufficiently definite," 22 N.Y. Jur. 2d Contracts § 20, such that Gordon and Dingman incurred liability in the United States with respect to a security. *See, e.g., United States v. Vilar*, 729 F.3d 62, 78 (2d Cir. 2013) ("[T]he record contains facts 'concerning the formation of the contracts' and 'the exchange of money,' which are precisely the sort we indicated may suffice to prove that irrevocable liability was incurred in the United States.").[9]

---

[9] Dingman counters that the Agreement was not a binding contract because the Agreement specified that he would refund Gordon's investment if they could not agree to "a written document memorializing the terms of Gordon's investment." App. 269. He contends that this illustrates that the parties did "not intend to be bound until their

-13-

The district court assumed that the Agreement was a binding contract but nonetheless concluded that both parties' liabilities were "revocable" because, had the Bahamian authorities refused to approve the issuance of shares, Dingman "was bound to return to Gordon all funds paid by Gordon." Sp. App. 22-23. We disagree with the district court, however, and hold that irrevocable liability was incurred when the parties entered into the Agreement.

In this Court's recent decision in *Choi v. Tower Research Capital LLC*, 890 F.3d 60 (2d Cir. 2018) (amended opinion), we addressed whether irrevocable liability was incurred in the United States where trades were "matched" with counterparties in the United States, but "cleared and settled" in Korea the following day. We rejected the contention that the parties had not incurred irrevocable liability in the United States because the foreign exchange could cancel or modify a trade at any time prior to the "clearing and settlement"

---

agreement [was] reduced to writing," and thus, the Agreement was not binding. *Chatterjee Fund Mgmt., L.P. v. Dimensional Media Assocs.*, 260 A.D.2d 159, 159 (1st Dep't 1999). Gordon and Dingman's subsequent conduct belies this argument. Gordon would not have wired $100,000, and Dingman would not have confirmed it as an investment, unless both understood the Agreement to be a binding investment contract. *See* Restatement (Second) of Contracts § 4 (1981) ("A promise . . . may be inferred wholly or partly from conduct."); *see also Richbell Info. Servs. Inc. v. Jupiter Partners, L.P.*, 309 A.D.2d 288, 297 (1st Dep't 2003) ("The intention to commit an agreement to writing will not prevent contract formation prior to execution.").

-14-

abroad. We explained that "[w]hether the exchange can cancel or modify trades . . . says nothing about whether either trading party is free to revoke its . . . acceptance of a trade" after matching, and "that the exchange has the power to rectify errors in the parties' contracts does not render those contracts 'revocable' in any meaningful sense." *Id.* at 68.

As in *Choi,* the fact that the parties' obligations were ultimately subject to a condition subsequent does not mean that either party was effectively "free to revoke its . . . acceptance," or change its mind until the approval of the shares abroad. *Id.* Nor does the fact Dingman could have been required to return Gordon's investment render Gordon's obligation to pay Dingman in exchange for OWH equity freely "'revocable' in any meaningful sense." *Id.* Gordon was committed to the transaction when Dingman offered, and Gordon agreed to purchase, a 50% interest in OWH through funds wired to Dingman's accounts. That Agreement occurred in New York.

A number of district courts within this Circuit have similarly found that, under *Absolute Activist*, irrevocable liability may be incurred despite the existence of conditions necessary to closing the transaction abroad, including foreign approval. *See, e.g.*, *Liberty Media Corp. v. Vivendi Universal SA*, 861 F.

Supp. 2d 262, 269 (S.D.N.Y. 2012).  Other courts have held that liability was irrevocable when the party "no longer had the discretion to revoke acceptance," notwithstanding that the transaction was not completed until other conditions were met abroad.  *Arco Capital Corps., Ltd. v. Deutsche Bank AG*, 949 F. Supp. 2d 532, 543 (S.D.N.Y. 2013) (plaintiffs plausibly alleged that irrevocable liability was incurred when funds were delivered to New York even though the purchase involved a Cayman Islands' purchaser and Cayman Islands' issuer, and was completed only upon acceptance by the Issuer in the Cayman Islands); *see also Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 2 F. Supp. 3d 550, 561 (S.D.N.Y. 2014) (plaintiffs-purchasers of a Kazakhstani bank's securities incurred irrevocable liability in the United States because whether they could revoke their purchases depended on circumstances "out of their control," that is, they could revoke only if the bank took certain "adverse" actions up until the restructuring was approved by the creditors and the Kazakhstani court).

As in *Atlantica*, whether the circumstances allowing Gordon to "revoke" his purchase would come to pass was an outcome entirely out of Gordon's control and depended solely on subsequent actions taken by the Bahamian authorities.  *See Atlantica Holdings*, 2 F. Supp. 3d at 561.  Therefore, as a

practical matter, Gordon was contractually obligated and he could not, on his own accord, revoke the Agreement. This is sufficient to satisfy the test for irrevocable liability set forth in *Absolute Activist*. *See Absolute Activist*, 677 F.3d at 68 ("[I]t is sufficient for a plaintiff to allege facts leading to the plausible inference that . . . the purchaser incurred irrevocable liability within the United States to take and pay for a security.").

On the facts alleged in the SAC, the Agreement was entered into in New York, and irrevocable liability was incurred in the United States. Accordingly, we conclude that Gordon plausibly alleged a domestic transaction cognizable under section 10(b).

## II. Predominately Foreign

### A. *Applicable Law*

In *Parkcentral Global HUB Ltd. v. Porsche Automobile Holdings SE*, we qualified the scope of the *Absolute Activist* decision. 763 F.3d 198 (2d Cir. 2014) (per curiam). We held that while the presence of a "domestic transaction" in a security is a necessary element of a section 10(b) claim (unless the transaction is in a security listed on a domestic exchange), it is not necessarily sufficient to make the invocation of section 10(b) appropriately domestic. *Id.* at 215. In

certain cases, the facts may be so predominantly foreign as to render the application of section 10(b) impermissibly extraterritorial.  *See id.*

In *Parkcentral*, we cautioned that this Court "do[es] not purport to proffer a test that will reliably determine when a particular invocation of § 10(b) will be deemed appropriately domestic or impermissibly extraterritorial."  *Id.* at 217.  Rather, "courts must carefully make their way with careful attention to the facts of each case."  *Id.*  "The potential for incompatibility between U.S. and foreign law is just one form of evidence that a particular application of a statute is extraterritorial.  It is neither a safe harbor nor the only relevant consideration in the extraterritoriality analysis."  *Id.* at 216-17.

### B.    *Application*

Dingman argues that even assuming the Agreement was a "domestic transaction," it cannot serve as the basis of a section 10(b) claim because Gordon's claims are so predominantly foreign as to render them "impermissibly extraterritorial."  *Id.* at 216.

We disagree.  *Parkcentral* involved securities-based swap agreements and the foreign company defendant was not a party to the agreements.  The swaps were pegged to the price of shares traded only on European exchanges.

The allegedly fraudulent conduct involved statements made primarily in Germany with respect to stock in a German company, and such misconduct was already the basis of several foreign investigations and enforcement actions. Accordingly, we found that the application of section 10(b) to the *Parkcentral* defendants "so obviously implicate[d] the incompatibility of U.S. and foreign laws" that Congress could not have intended it in "a manner consistent with the presumption against extraterritoriality." *Id*.

The facts in this case, however, do not present nearly the same level of foreign entanglement as presented in *Parkcentral*. Defendants point to the following: Dingman is a permanent resident of the Bahamas; the venture involved development and operation of restaurants, bars, and hotels in the Bahamas; the entities were incorporated in the Bahamas by a Bahamian lawyer; witnesses and the books and records are in the Bahamas; and "a United States court cannot direct Dingman or Out West to issue shares to Gordon in contravention of Bahamian regulations." Def.-Appellee's Br. at 26-28.

We are not persuaded that the foreign components present in this dispute render the claims impermissibly extraterritorial. As discussed above, the SAC alleges substantial domestic contacts. The Agreement was entered into in

New York; Dingman continued to press Gordon for further investments in New York; Dingman and Gordon were both U.S. citizens; the wire transfers originated from New York; and the confirmation letters were sent to New York. The only foreign component present in the formation of the Agreement was the eventual registration of the shares "with the appropriate Bahamian authorities," an act that Dingman agreed to undertake per the Agreement. *See* SAC ¶ 24. Accordingly, we reject the argument that the Agreement is so predominately foreign as to be impermissibly extraterritorial.

## *CONCLUSION*

For the foregoing reasons, the judgment of the district court is **VACATED** and the case is **REMANDED** for further proceedings.