17-0887-cv
*Empire Merchants, LLC, et al. v. Reliable Churchill, LLLP, et al.*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

August Term 2017

(Argued: October 10, 2017　　　Decided: August 28, 2018)

No. 17-0887-cv

_____

EMPIRE MERCHANTS, LLC,

*Plaintiff-Appellant,*

EMPIRE MERCHANTS NORTH, LLC,

*Plaintiff,*

-v.-

RELIABLE CHURCHILL LLLP, SAM LIQUORS INC., BIN LUO, AKA CHEN, BAO LIQUORS INC., BAO XIONG ZHENG, AKA BAO XION ZHENG, AKA BAO XING ZHENG, TING WEI, LTT WHISKEY, INC., YI FENG GAO,

*Defendants-Appellees,*

NILESHKUMAR JASBHAI PATEL, AKA NICK PATEL, PRATIBHA PATEL, AKA PANNA PATEL, TECH PRIDE OF AMERICA, INC., DBA HAPPY 40 LIQUORS, DBA HAPPY 40 WINES & SPIRITS, DBA HAPPY 40 DISCOUNT LIQUORS, ANIL PATEL, DILIP C. PATEL, PRAKASH PATEL, J&R COMPANY LLC, DBA NORTH EAST LIQUORS, JATIN B. PATEL, AKA JATTINKUMAR B. PATEL, VLAMIS LIQUORS LLC, DBA VLAMIS' CUT-RATE LIQUORS, OUR LIQUOR, INC., ALEXANDER J. LEW, JOHN DOE, DEFENDANTS NUMBERS

1

1-50, Tushar C. Patel, Ke Yao, Breakthru Beverage Group, LLC, Arlyn B. Miller, Charles Merinoff, Gregory L. Baird,

*Defendants.*

_____

Before:      Pooler, Livingston, *Circuit Judges*, Crawford, *District Judge.*[1]

Empire Merchants, LLC ("Empire"), the New York metropolitan area's exclusive distributor for many leading brands of liquor, sued defendants under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, alleging that they smuggled liquor into New York State, depriving Empire of sales it would have otherwise made. The district court granted defendants' Fed. R. Civ. P. 12(b)(6) motion to dismiss because, *inter alia*, the smuggling operation, as alleged, did not directly cause Empire to lose sales, and therefore Empire did not adequately allege proximate cause under RICO. We hold that Empire's Amended Complaint did not adequately allege proximate cause. Accordingly, the judgment of the district court is **AFFIRMED**.

| | |
|---|---|
| For Plaintiff-Appellant: | Caitlin J. Halligan, Gibson, Dunn & Crutcher, LLP, New York, NY (Randy M. Mastro, Matthew J. Benjamin, Gibson, Dunn & Crutcher LLP, New York, NY, William E. Thomson, Gibson, Dunn & Crutcher LLP, Los Angeles, CA, *on the brief*) |
| For Defendants-Appellees: | Sean F. O'Shea (Helen M. Maher, *on the brief*), Boies, Schiller Flexner LLP, New York, NY, *for* Defendant-Appellee Reliable Churchill LLP |

---

[1] Judge Geoffrey W. Crawford, of the United States District Court for the District of Vermont, sitting by designation.

Ronald D. Degen, O'Rourke & Degen, PLLC, New York, NY, *for* Defendant-Appellee LTT Whiskey Inc.

DEBRA ANN LIVINGSTON, *Circuit Judge*:

This is a case about proximate cause under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq*. Plaintiff-Appellant Empire Merchants, LLC ("Empire"), a distributor of alcoholic beverages, is New York State's exclusive distributor for popular brands like Johnnie Walker, Grey Goose, and Seagram's Gin. Empire alleges that from at least 2008 to 2014, Defendant-Appellee Reliable Churchill LLLP ("Reliable") and (non-party) Republic National Distributing Company ("RNDC"), two of Maryland's largest liquor distributors, conspired with retail liquor stores in Cecil County, Maryland ("Cecil County retailers") and New York City ("New York retailers") to smuggle liquor from Maryland to New York, in violation of New York liquor law. Empire sued Reliable and several Cecil County and New York retailers under RICO, alleging that their bootlegging directly harmed Empire "because every case of alcohol smuggled into New York from Maryland was a lost sale by New York's authorized distributors—of which Empire was the largest." J.A. 172. The defendants moved to dismiss under Fed. R. Civ. P. 12(b)(6), arguing in part that

3

the smuggling operation did not directly cause Empire to lose sales, and therefore that Empire had not adequately alleged proximate cause under RICO. The district court agreed and dismissed the case, and Empire appealed. Because Empire failed to allege proximate cause adequately, we AFFIRM the judgment of the district court.

## BACKGROUND

### I. Factual Background[2]

As relevant here, the American alcohol industry consists of three different groups of entities: (1) suppliers, who produce the alcohol in breweries, vineyards, and distilleries; (2) distributors, who purchase liquor from suppliers in bulk and sell it to retail liquor stores, restaurants, and bars; and (3) retailers, the liquor stores, restaurants, and bars that ultimately sell liquor to consumers. Many suppliers and distributors enter into contracts with one another, giving the distributors "the exclusive right to distribute that supplier's products in-state." J.A. 200. Both the federal government and New York State license suppliers and

---

[2] The factual background presented here is derived from allegations in the Amended Complaint, which we accept as true in considering a Rule 12(b)(6) motion to dismiss. *See Giunta v. Dingman*, 893 F.3d 73, 78 (2d Cir. 2018).

4

distributors, and many states and municipalities tax the sale of liquor. *See, e.g.*, 27 U.S.C. § 203(c); N.Y. Alco. Bev. Cont. Law § 62.

Empire is the largest liquor distributor in the New York metropolitan area and has exclusive distribution contracts for that area with some of the world's leading liquor suppliers, giving it exclusive rights to distribute popular brands like Johnnie Walker and Smirnoff. It alleges that from at least 2008 to 2014, Reliable and RNDC conspired with the Cecil County and New York retailers to smuggle liquor from Maryland to New York, thus violating state and federal law, interfering with Empire's exclusive New York distribution rights, and depriving Empire of millions of dollars in lost sales.[3]

The scheme was simple. The New York retailers would make interstate phone calls and send interstate faxes and emails to Cecil County retailers requesting liquor, and the Cecil County retailers passed on the orders to Reliable and RNDC. Reliable and RNDC sold the requested products to the Cecil County retailers at discount. The New York retailers paid for the liquor in cash

---

[3] Empire Merchants North, LLC is an affiliated distributor based in upstate New York. This appeal by and large concerns injuries suffered by Empire Merchants, LLC, rather than injuries to Empire Merchants North, LLC, so for purposes of this opinion, "Empire" refers to Empire Merchants, LLC, the Plaintiff-Appellant.

(sometimes up to $20,000 at a time) and smuggled it in vans and trucks from Maryland to New York. The Cecil County retailers deposited the cash into bank accounts and wrote checks from those accounts to pay Reliable and RNDC.[4]

Empire alleges that Reliable knew about the smuggling and that many of its employees encouraged and even helped coordinate the scheme. Some Reliable employees helped Cecil County retailers remove Maryland stickers from its liquor crates to help smugglers evade detection, at least one Reliable salesman lied to a Cecil County retailer who expressed concern that Reliable was encroaching on Empire's exclusive rights, and Reliable may have even been in direct contact with the smuggling New York retailers. Both Reliable and RNDC also track retailers' weekly sales and would have noticed the large purchasing discrepancies in rural Cecil County. And many Cecil County and New York retailers, according to the Amended Complaint, have admitted to smuggling.[5]

---

[4] RNDC is not a named defendant in this case because "there is very little overlap in the products that" it and Empire sell, "meaning that RNDC's bootlegging likely did not harm Empire greatly." J.A. 221. By contrast, "approximately 64% to 78% of Empire's total sales come from products also distributed by Reliable Churchill." *Id.*

[5] Defendant-Appellee LTT Whiskey ("LTT"), a New York retailer, is not one of them, and the Amended Complaint's factual allegations regarding LTT's participation in the scheme are largely circumstantial. Thus, in 2009, it allegedly received "more than twenty cases of liquor from Maryland" and "suspiciously reduced its purchases . . . of alcohol for which Empire was the exclusive distributor." J.A. 249–50. In 2014 and 2015, it did not buy any 750-ml or 1-liter Grey Goose bottles from Empire but was always fully

At all relevant times during the alleged smuggling operation, Maryland's excise liquor tax was $1.50/gal, and the total excise tax in New York City (state and local tax included) was $7.44/gal. In both Maryland and New York, distributors are responsible for paying alcohol excise taxes. The operation "was predicated on" this $6/gal tax difference. *Id.* at 204. Smuggling allowed the New York retailers to buy liquor at a discount and then sell it at New York prices. For the Cecil County retailers, Reliable, and RNDC, the bootlegging scheme opened a much larger market, as Cecil County has a population of 78,000 people, about 0.3% the population of metropolitan New York. Profits soared. One Cecil County retailer sold $300,000 of liquor to New York in a nine-day period. Reliable alone sold over 272,000 cases (5.8 million bottles) as part of this smuggling operation, "resulting in gross revenues of more than $40 million." *Id.* at 181.

But the operation cost New York State, New York City, and, according to the Amended Complaint, Empire. "By willfully avoiding the payment of the much higher New York State and New York City excise tax on alcohol," the Amended Complaint alleges, the defendants deprived the State and City "of

stocked with both. And finally, it never purchased any Johnnie Walker from Empire from 2008 through 2016, and Empire alleges that it is highly unlikely that LTT never sold any Johnnie Walker during that time.

millions of dollars in tax revenue." *Id.* at 183–84. It also "caused Empire at least tens of millions of dollars in lost sales damages" because "every case of alcohol smuggled into New York from Maryland was a lost sale by New York's authorized distributors — of which Empire is the largest." *Id.* at 172, 189.

Empire first learned of the smuggling operation in May 2016 when the United States Attorney's Office for the District of Maryland indicted RNDC and several co-conspirators for wire fraud and money laundering. Reliable is also alleged to have "been under investigation for the same smuggling activity and negotiating to resolve potential charges against the company" since at least 2013. *Id.* at 184.

## II.   Procedural History

Empire sued Reliable and the other defendants in the United States District Court for the Eastern District of New York (Ross, *J.*) on September 20, 2016, and filed an Amended Complaint on December 9, 2016. As relevant here, the Amended Complaint alleged:

- substantive violations of RICO, 18 U.S.C. § 1962(c), based on a pattern of mail and wire fraud, money laundering, and violations of the Travel Act, 18 U.S.C. § 1952;

- conspiracy under RICO, *id.* § 1962(d); and

- several claims under state law.

8

Empire sought compensatory damages "for every . . . sale it lost as a result of the bootlegging scheme," treble damages and attorney's fees under RICO, punitive damages, and declaratory and injunctive relief.   J.A. 189.   But on March 16, 2017, the district court granted the Defendants' Rule 12(b)(6) motion to dismiss.   *See Empire Merchants, LLC v. Reliable Churchill LLLP*, No. 16CV5226ARRLB, 2017 WL 5559030 (E.D.N.Y. Mar. 16, 2017).

The bulk of the district court's analysis concerned Empire's allegations of wire fraud as a RICO predicate offense.   Wire fraud, 18 U.S.C. § 1343, has three elements: (1) a scheme to defraud, (2) money or property that is the object of the scheme, and (3) use of the wires to further the scheme.   *Fountain v. United States*, 357 F.3d 250, 255 (2d Cir. 2004).   Focusing principally on the first element, the court held that Empire largely failed to allege a scheme to defraud, and to the extent that it had adequately pled such a scheme, it had not alleged that the wire fraud proximately caused its injuries.   Empire argued that the smuggling operation itself constituted the requisite "scheme to defraud."   The district court rejected this characterization, however, insisting that the smuggling operation was not a single scheme to defraud, but three schemes: (1) smuggling to avoid paying liquor taxes; (2) smuggling to violate New York's liquor licensing laws; and (3)

9

smuggling to interfere with Empire's exclusive distribution contracts. It then concluded that Empire failed to allege proximate cause for the first and second schemes to defraud, and that the third was not a cognizable scheme at all.

First, although "a smuggling scheme to defraud the government of excise taxes constitutes a 'scheme to defraud' under the wire fraud statute," the court reasoned, Empire had "disclaim[ed] any reliance on defendants' tax evasion in its RICO allegations." *Id.* at *8 (emphasis removed). Empire had also not pled that the alleged tax evasion directly caused Empire's injuries, which meant that Empire had failed to plead proximate cause under *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006). Second, to the extent that Empire alleged that the smuggling operation violated New York State's liquor licensing laws, those state law violations did not proximately cause Empire's injuries either because "Empire would have suffered the identical injury at the hands of a licensed wholesaler." *Id.* at *12. Finally, a smuggling scheme that interfered with Empire's exclusive distribution contracts, the district court concluded, was not a scheme to defraud because, though potentially actionable under New York tort law, "the act of selling" liquor in violation of another's contractual rights is "not itself deceitful." *Id.* at *10.

The court then dismissed Empire's RICO claims predicated on mail fraud, 18 U.S.C. § 1341, money laundering, *id.* § 1956, and violations of the Travel Act, *id.* § 1952. Empire did not adequately allege mail fraud because the complaint did not mention any specific use of the mails to further the smuggling operation. The defendants' alleged money laundering — the Cecil County retailers' deposits and withdrawals of the New York retailers' cash payments — may have helped conceal the smuggling from government regulators but did not, on its own, proximately cause Empire's injuries. The Travel Act violations were "wholly derivative of the[] money laundering allegations" and therefore failed for the same reason. *Id.* at *16. Finally, the court dismissed the RICO conspiracy claim for lack of proximate cause and denied Empire leave to amend on futility grounds. Accordingly, it dismissed Empire's RICO claims with prejudice and declined to exercise supplemental jurisdiction over its state law claims.

The court entered final judgment on March 23, 2017, and Empire filed a timely notice of appeal six days later.

## DISCUSSION

Empire argues on appeal that the district court erred in dismissing its RICO claim predicated on wire fraud. It also contends that the court erred in

11

dismissing its money laundering and Travel Act–based RICO predicates and in denying it leave to amend. The bulk of this case turns on the first issue because each of Empire's RICO predicates relies on the same proximate cause theory. Though the district court erred in how it characterized Empire's wire fraud–based RICO claim, we agree with the district court that Empire did not adequately allege proximate cause. We therefore AFFIRM the decision below.[6]

**I**

We review *de novo* a district court's dismissal pursuant to Fed. R. Civ. P. 12(b)(6), "accepting all factual allegations as true and drawing all reasonable inferences in favor of the plaintiff." *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "We review a district court's denial of leave to amend for abuse

—————————

[6] *See Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 405 (2d Cir. 2006) ("[W]e are free to affirm a decision on any grounds supported in the record, even if it is not one on which the trial court relied.").

of discretion, unless the denial was based on an interpretation of law, such as futility, in which case we review the legal conclusion *de novo*." *Pyskaty v. Wide World of Cars, LLC*, 856 F.3d 216, 224 (2d Cir. 2017) (quoting *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 119 (2d Cir. 2012)). "Futility is a determination, as a matter of law, that proposed amendments would fail to cure prior deficiencies or to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure." *Id.* at 224–25 (quoting *Panther Partners*, 681 F.3d at 119).

## II

RICO creates a private cause of action for "[a]ny person injured in his business or property by reason of a violation of section 1962" of RICO. 18 U.S.C. § 1964(c). Among other things, § 1962 makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." *Id.* § 1962(c). "[R]acketeering activity," as defined in RICO, comprises a wide variety of criminal offenses, including, as relevant here, wire fraud, mail fraud, money laundering, and violations of the Travel Act. *Id.*

§ 1961(1). The RICO offense alleged here is that the defendants were an "enterprise" engaged in "a pattern" of, principally, wire fraud. *See id.* § 1962(c).

As noted above, wire fraud has three elements: (1) a scheme to defraud, (2) money or property that is the object of the scheme, and (3) use of the wires to further the scheme. *Fountain*, 357 F.3d at 255. The first element, the scheme to defraud, "is measured by a nontechnical standard. It is a reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society." *United States v. Trapilo*, 130 F.3d 547, 550 n.3 (2d Cir. 1997) (internal quotation marks and brackets omitted) (quoting *United States v. Von Barta*, 635 F.2d 999, 1005 n. 12 (2d Cir. 1980)). To meet the second element, the plaintiff must show that the object of the scheme — "the thing obtained," or to be obtained — is "property in the hands of the victim," *Cleveland v. United States*, 531 U.S. 12, 15 (2000), which can include a right to uncollected excise taxes, *see Pasquantino v. United States*, 544 U.S. 349, 355–56 (2005). And any wire that "is part of the execution of the scheme [to defraud] as conceived by the perpetrator at the time" satisfies the third element. *Schmuck v. United States*, 489 U.S. 705, 715 (1989).

14

To sue under RICO, a plaintiff must also establish that the underlying § 1962 RICO violation was "the proximate cause of his injury." *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 132 (2d Cir. 2010). This means that there must be some "direct relation between the injury asserted and the injurious conduct alleged." *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992).

Empire contends that the district court erred in two principal respects. First, the court should have considered the smuggling operation to be a single scheme to defraud, rather than disaggregate it into three separate ones. Second, Empire argues that the district court erred in holding that the wire fraud–RICO predicate acts did not proximately cause its injuries. For the reasons that follow, we agree with Empire on the first issue but disagree on the second.

**A**

At the start, the parties disagree about how we should characterize the alleged scheme to defraud. Again, the district court disaggregated the smuggling operation into three different schemes: one to deprive New York State of tax revenue, another to violate New York liquor licensing laws, and the third to interfere with Empire's sales. For the following reasons, we disagree as to this characterization of the allegations in Empire's Amended Complaint.

15

As Empire observes, it alleged *one* smuggling operation, not three. Just because this scheme had three *effects* — tax evasion, violation of New York's liquor licensing laws, and interference with contract — does not mean that there were three different schemes. Smuggling constitutes a "scheme to defraud" because "its sole purpose is to conceal what the smuggler is carrying." *A. Terzi Prods., Inc. v. Theatrical Protective Union*, 2 F. Supp. 2d 485, 501 (S.D.N.Y. 1998) (Sotomayor, *J.*); *see also Pasquantino*, 544 U.S. at 357. It does not matter which laws the smugglers break, nor does it matter who is harmed. *See Trapilo*, 130 F.3d at 550 n.3; *A. Terzi Prods.*, 2 F. Supp. 2d at 501.

We conclude that Empire adequately alleged a smuggling scheme, thus satisfying the first element of wire fraud. We also agree with the district court that Empire satisfied the third element of wire fraud because the Amended Complaint lists "dozens of specific wire communications allegedly made by defendants." *Empire*, 2017 WL 5559030, at *7. And at least as to New York State's tax revenue, Empire sufficiently alleged that money or property was the object of this scheme. *See Pasquantino*, 544 U.S. at 357 (noting that smuggling scheme to conceal imported liquor from Canadian officials constituted a scheme or artifice to defraud Canada of "taxes due on the smuggled goods" under the wire

16

fraud statute). The district court held that Empire had not adequately alleged smuggling to deprive New York State of tax revenue on the theory that Empire "disclaim[ed] any reliance on defendants' tax evasion in its RICO allegations." *Empire*, 2017 WL 5559030, at *8 (emphasis removed). But this was error. Under RICO, "a person can be injured 'by reason of' a pattern of mail [or wire] fraud even if he has not himself relied on any misrepresentations." *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654–55 (2008); *see also Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1, 17 (2010) (plurality opinion).[7]

**B**

That brings us to the issue of proximate cause. The Supreme Court held in *Holmes* that a plaintiff suing under RICO must establish that the RICO offense was the "proximate cause" of the plaintiff's injuries. 503 U.S. at 268. "Proximate cause . . . requires 'some direct relation between the injury asserted and the injurious conduct alleged,'" and "[a] link that is 'too remote,' 'purely contingent,'

---

[7] To be clear, Empire's Amended Complaint also alleges that its own lost sales were an "object of the scheme." We are skeptical that "lost sales" in this context can constitute an object of the scheme, however, because the "object of the fraud" must be "'property' *in the victim's hands*," and "[i]t does not suffice . . . that the object of the fraud *may become property* in the recipient's hands." *Cleveland*, 531 U.S. at 15 (emphasis added). But our analysis of proximate cause and thus the merits of the case do not turn on this issue, so we decline to resolve it.

17

or 'indirec[t]' is insufficient." *Hemi*, 559 U.S. at 9 (plurality opinion) (quoting

*Holmes*, 503 U.S. at 268, 271, 274). We thus rarely "go beyond the first step" when

assessing causation under civil RICO. *Id.* at 10 (quoting *Holmes*, 503 U.S. at 271).

And "[w]hat falls within that 'first step' depends in part on . . . an assessment 'of

what is administratively possible and convenient.'" *Bank of Am. Corp. v. City of*

*Miami, Fla.*, 137 S. Ct. 1296, 1306 (2017) (quoting *Holmes*, 503 U.S. at 268). Relevant

administrative difficulties in the civil RICO context include, among other factors:

- whether it would difficult to determine how much the tortious conduct injured the defendant, as compared to other factors; and

- whether more directly injured victims would be better suited as plaintiffs.

*See Hemi*, 559 U.S. at 11–12, 14–15 (plurality opinion); *Bridge*, 553 U.S. at 654–55;

*Anza*, 547 U.S. at 458–60; *Holmes*, 503 U.S. at 273, 269–70.

The Supreme Court's civil RICO jurisprudence helps elucidate these

principles. In *Holmes*, insurers alleged that stock manipulators' tortious conduct

proximately caused their injuries because the insurers had to pay for their

customers' losses. The Supreme Court held that this causal chain was too indirect

because the fraud harmed the insurers "only insofar as the stock manipulation first

injured the broker-dealers." *Holmes*, 503 U.S. at 271. In *Anza*, the Court held

that a business could not sue a tax-evading competitor, even though this tax-

18

dodging made it possible for the competitor to undercut the plaintiff on prices. The Court reasoned that it would be difficult to determine how much of the price drop was attributable to the tax-dodging and how many customers were lost because of the price drop, and further that the state government deprived of tax revenue was a more "immediate victim[]." *Anza*, 547 U.S. at 458–60. And in *Hemi*, a plurality of the Court held that New York City could not sue a cigarette company for failing to provide details of its sales to New York State, even though this failure made it harder for the City to pursue tax evaders. This causal connection was too indirect because it was tax evasion, not the failure to keep the State apprised of sales data, that harmed the City, and because the State was "better situated than the City" to sue. *Hemi*, 559 U.S. at 11–12 (plurality opinion).

Empire relies heavily on *Bridge*, the sole case in which the Supreme Court has discussed proximate causation in the civil RICO context and found it to be adequately alleged. That case involved competitors who bid on auctioned tax liens. When two bids were equal, the county would mechanically allocate liens "on a rotational basis" between the tying bidders. *Bridge*, 553 U.S. at 643. The plaintiffs alleged that the defendants had manipulated this "rotational" system by submitting multiple bids, guaranteeing them more successful bids than they were

19

allowed. The Court held that the plaintiffs' "loss of valuable liens" was "the direct result" of the fraud because there were "no independent factors that account[ed] for [the plaintiffs'] injury," nor was there a "more immediate victim [] better situated to sue," as the county was not financially injured by the fraud. *Id.* at 658.

Empire asserts that its proximate cause theory is straightforward and like that in *Bridge*: it alleges that every crate of every Empire-exclusive brand smuggled into New York cost it a sale. We disagree. As in *Anza* and *Hemi*, and unlike *Bridge*, Empire has not and cannot allege that the asserted racketeering activity directly caused its injury. This is so for three principal reasons: (1) Empire was harmed by the New York retailers' decisions to purchase less alcohol from Empire, which is not itself racketeering activity; (2) the asserted causal relationship between the alleged racketeering and retailers' decisions to purchase less alcohol from Empire is intricate and uncertain, as in *Anza* and *Hemi*, and not *Bridge*; and (3) New York State is a better situated plaintiff that was more directly harmed by the defendants' alleged racketeering.

First, just like in *Anza*, "[t]he cause of [Empire's] asserted harms . . . is a set of actions [(not buying Empire liquor)] entirely distinct from the alleged RICO

20

violation [(smuggling liquor into New York)]." 547 U.S. at 458; *see also Amsterdam Tobacco Inc. v. Philip Morris Inc.*, 107 F. Supp. 2d 210, 219 (S.D.N.Y. 2000) (holding that "the 'but for' cause" of a tobacco manufacturer's lost sales, in a case similar to this one, "was, among other things, the smuggling activity *and the decision by New York consumers not to purchase cigarettes from Plaintiffs*" (emphasis added)). Perhaps the smuggling operation led New York retailers to purchase less liquor from Empire, but the decisions of these various retailers not to purchase Empire's liquor were not themselves acts of racketeering. *See Hemi*, 559 U.S. at 13 (plurality opinion) (explaining that "the compensable injury flowing from a RICO violation . . . necessarily is the harm *caused by the predicate acts*" (quoting *Anza*, 547 U.S. at 457) (emphasis added) (brackets and internal quotation marks omitted)). Empire's theory of causation thus requires us to "go beyond the first step" in the causal chain. *Id*. at 10.[8]

---

[8] In *D'Addario v. D'Addario*, we held that a plaintiff may recover damages equal to the direct harm suffered plus any "related [] expenses" that the plaintiff incurred "to halt [the defendant's] wrongdoing." No. 17-1162-CV, 2018 WL 3848501, at \*11 (2d Cir. Aug. 14, 2018). But this part of *D'Addario* concerned only the *damages* that an otherwise directly injured plaintiff may recover. *See id.* (holding that the plaintiff established proximate cause because the defendant's RICO violations directly "destroyed the value" of the plaintiff's estate). *D'Addario* did *not*, by contrast, purport to alter the Supreme Court's proximate cause jurisprudence for civil RICO. *See id.* (citing, in support of its reasoning, *Bankers Tr. Co. v. Rhoades*, 859 F.2d 1096, 1105 (2d Cir. 1988), and *Stochastic Decisions, Inc. v. DiDomenico*, 995 F.2d 1158, 1166 (2d Cir. 1993), which both concerned the

Second, "the predicate act of [smuggling] and the separate act of [not buying Empire's liquor] do not *necessarily* follow from one another," Reply Br. 10 n.4 (emphasis added), as was true in *Bridge*. Empire's "lost sales could [thus] have resulted from factors other than petitioners' alleged acts of fraud." *Anza*, 547 U.S. at 459. For example, Reliable suggests that Empire might "have lost sales due to bootlegging from states with even lower alcohol excise taxes."[9] Reliable Br. 20. Or various retailers might have purchased wine, beer, or a brand of liquor not subject to Empire's exclusive distribution contracts to offer something new to consumers or to respond to changes in consumer tastes.

---

scope of RICO damages, not proximate cause); *see also Hemi*, 559 U.S. at 10 (plurality opinion) (holding that courts should not "go beyond the first step" in causal analysis) (quoting *Holmes*, 503 U.S. at 271–72).

[9] Thus, suppose that in 2009, a New York retailer calculated per-bottle profits from Empire Johnnie Walker, smuggled Johnnie Walker from Reliable, and smuggled Johnnie Walker from New Hampshire distributors at $1/bottle, $3/bottle, and $2/bottle, respectively:

| Empire Johnnie Walker | Reliable Johnnie Walker | New Hampshire Johnnie Walker |
| --- | --- | --- |
| $1 profit/bottle | $3 profit/bottle | $2 profit/bottle |

A rational retailer would buy Reliable Johnnie Walker over the other two options. But if the defendants had not smuggled Maryland liquor to New York, the retailer would have purchased smuggled Johnnie Walker from New Hampshire, not Empire's legal Johnnie Walker. In this scenario, Empire would have lost Johnnie Walker sales no matter what the defendants did, which means that the smuggling did not necessarily cause its injuries.

The causal connection in this case is thus far less certain than that in *Bridge* where, thanks to the "zero-sum nature of the auction," the fraud *"necessarily"* deprived the plaintiffs of sales. *See Hemi*, 559 U.S. at 15 (plurality opinion) (emphasis added). Here, though Empire was New York State's exclusive lawful distributor for many brands, the market was far from "zero-sum." Sorting out Empire's counterfactual sales in this scenario would thus prove "speculative in the extreme." *Canyon Cty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 983 (9th Cir. 2008). As the Court recognized in *Anza*, "[b]usinesses lose and gain customers for many reasons . . . ." 547 U.S. at 459.

To be sure, Empire's Amended Complaint alleges a straightforward causal connection (albeit conclusorily) and in the pleadings phase, we ordinarily accept well-pled allegations as true, notwithstanding possible alternative causal explanations. But in the RICO context, "[t]he element of proximate causation . . . is meant to prevent these types of intricate, uncertain inquiries from overrunning RICO litigation." *Anza*, 547 U.S. at 460. That is why the Supreme Court engaged in this exact same kind of counterfactual reasoning at the pleadings stage in *Anza*, even though the dissent criticized the majority for doing so. *See id.* at 458–60; *id.* at 468 (Thomas, *J.*, concurring in part and dissenting in part) ("[U]nder

23

the facts as alleged . . . [the defendant] did not generally lower its prices, so the Court need not inquire into 'any number of reasons' that it might have done so." (internal citation omitted)); *see also Canyon Cty.*, 519 F.3d at 983 n.12 ("[C]ourts need not allow RICO plaintiffs leeway to continue on with their case in an attempt to prove an entirely remote causal link."). And the Supreme Court has suggested that there is an even greater need to apply this kind of skepticism "to claims brought by economic competitors" because such claims, "if left unchecked, could blur the line between RICO and the antitrust laws." *Anza*, 547 U.S. at 460.

Finally, New York State was a more direct victim of the smuggling operation. *See, e.g.*, J.A. 174 (alleging that the Defendants' scheme "deprived New York State . . . of tens of millions of dollars in tax revenue"). The Supreme Court has repeatedly affirmed that the availability of "a more immediate victim [that] is better situated to sue" cuts against finding proximate cause. *Bridge*, 553 U.S. at 658; *see also Hemi*, 559 U.S. at 11–12 (plurality opinion); *Anza*, 547 U.S. at 458–60; *Holmes*, 503 U.S. at 269–70. Not only does New York State have every "incentive to sue," *Hemi*, 559 U.S. 12 (plurality opinion), it is also a more immediate victim. New York State lost tax revenue by virtue of the untaxed liquor crossing the border because the tax avoidance deprived it of its right "to collect money from

24

petitioners," which is itself a form of property. *Pasquantino*, 544 U.S. at 356. And it was this tax avoidance that gave New York retailers the incentive to buy and ship the bootlegged liquor in the first place. Had they paid New York's excise taxes, the smuggling operation would not have been profitable and thus never would have happened. *See* J.A. 204 (alleging that the smuggling scheme "was predicated" on tax avoidance). This case is thus just like *Anza*: the defendants did not pay taxes, and they "us[ed] the proceeds from [this] fraud" to undercut the plaintiff's sales. 547 U.S. at 457–58.

Adjudicating New York's claims would also be more "straightforward" than adjudicating Empire's. *Id.* at 460. "[W]hile it may be difficult to determine facts such as the number of sales [Empire] lost due" to the smuggling operation, as explained above, "it is considerably easier to make the initial calculation of how much tax revenue the [defendants] withheld from the State." *Id.*; *see also Bridge*, 553 U.S. at 658 (holding that the defrauded bidder, not the county, was the most directly injured because the county's injuries were at best "speculative and remote"). New York State can "be counted on to vindicate the law . . . without any of the problems attendant upon suits by plaintiffs injured more remotely," *Holmes*, 503 U.S. at 269–70, and so there is "no need to broaden the universe of

25

actionable harms to permit [a] RICO suit[]" in this case, *Anza*, 547 U.S. at 460; *see also Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1148–49 (9th Cir. 2008) (concluding that a plaintiff had not established proximate cause based on (1) the difficulty in ascertaining causation and (2) the existence of a more immediate victim of the racketeering); *James Cape & Sons Co. v. PCC Const. Co.*, 453 F.3d 396, 403–04 (7th Cir. 2006) (same).[10]

C

Empire makes four counterarguments in response, none of which we find persuasive. First, Empire maintains that it was the "foreseeable[] and intended target" of the defendants' racketeering, "as opposed to an accidental or incidental one." Pl.-Appellant Br. 43. Yet foreseeability and intention have little to no import for RICO's proximate cause test. As the *Hemi* plurality explained, "the dissent [in *Anza*] criticized the [*Anza*] majority's view for 'permitting a defendant to evade liability for harms that [were] not only foreseeable, but the intended consequences of the defendant's unlawful behavior.' But the dissent there did not carry the day . . . ." *Hemi*, 559 U.S. at 12 (plurality opinion) (internal citations,

---

[10] New York City is presumably as well situated as New York State, but none of the parties discuss its status as a potential plaintiff.

brackets, and emphasis omitted) (quoting *Anza*, 547 U.S. at 470 (Thomas, *J.*, concurring in part and dissenting in part)); *see also Anza*, 547 U.S. at 460 ("A RICO plaintiff cannot circumvent the proximate-cause requirement simply by claiming that the defendant's aim was to increase market share at a competitor's expense.").

To be sure, this Circuit used to place great weight on foreseeability and intent in our RICO proximate cause jurisprudence, and we relied heavily on both in *Ideal Steel Supply Corp. v. Anza*, 373 F.3d 251 (2d Cir. 2004). The Supreme Court then reversed us, *see Anza*, 547 U.S. at 462, and declined to mention either factor. *See Hemi*, 559 U.S. at 12 (plurality opinion) ("[I]n the RICO context, the focus is on the directness of the relationship between the conduct and the harm. Indeed, *Anza* and *Holmes* never even mention the concept of foreseeability.")[11]; *see also*

---

[11] Though Chief Justice Roberts wrote only for four Justices in *Hemi*, only three Justices dissented. Justice Sotomayor took no part in the consideration or decision of the case, and Justice Ginsburg concurred in the result while declining to "subscrib[e] to the broader range of the Court's proximate cause analysis." 559 U.S. at 19 (Ginsburg, *J.*, concurring in part and concurring in the judgment). It is thus not clear whether Justice Ginsburg disagreed with the plurality's analysis or merely declined to express a view. But regardless of whether there was a 4–3 majority or a 4–4 split on the relevance of intent and foreseeability in RICO's proximate cause jurisprudence, we find the plurality's interpretation of *Anza* and *Holmes* compelling. *See also id.* at 24 (Breyer, *J.*, dissenting) ("[S]ome of our opinions may be read to suggest that [proximate cause] in RICO do[es] not perfectly track common-law notions of proximate cause.").

27

Gregory P. Joseph, *Civil Rico: A Definitive Guide* 56 (3d ed. 2010) ("The requirements of RICO causation are stricter than those for common-law torts.").[12]

Second, Empire argues that it was more directly injured than New York State because "the government lost tax revenue only because Empire lost sales that would have generated that revenue." Reply Br. 7. This is incorrect. As explained above, New York State's "entitlement to tax revenue" is a property interest, and so it *was* deprived of that interest when Reliable directed its sales to New York without paying the New York excise taxes. *See Pasquantino*, 544 U.S. at 357. Empire, by contrast, alleged that it was injured because it *would have* sold more liquor but for the smuggling operation. These hypothetical lost sales are thus far less direct than defendants' abrogation of New York State's property interest.[13]

Third, Empire claims that it "seeks recovery for its own unique injury (stolen sales), not for unpaid taxes," and it is clearly therefore the most "directly injured victim[]." Reply Br. 17. But this just shows that Empire's injury is *distinct* from

---

[12] Our recent opinion in *D'Addario*, which refers — in passing — to RICO's "familiar 'proximate cause' standard," is not to the contrary. 2018 WL 3848501, at *11.

[13] Empire at one point suggests in its opening brief that the smuggling "devalued its exclusive distribution contracts," Pl.-Appellant Br. 41, but again, its sole allegation of injury was that the smuggling operation caused it to lose sales.

New York's, not that its injury was *directly caused* by the defendants' racketeering. Indeed, the plaintiffs in *Anza* also allegedly lost sales, but the Supreme Court still determined that New York was the most "immediate victim[]" of the defendants' racketeering scheme. *See Anza*, 547 U.S. at 460.

Fourth, Empire appears to contend that we should disregard, or at least pay little attention to New York's injury when assessing whether Empire was directly injured. Otherwise, Empire suggests, we would "leave[] no space for private RICO claims arising out of conduct that injures the government as well as a private party." Reply Br. 19. This would cripple civil RICO, Empire adds, because "over a dozen RICO predicates necessarily harm the government." *Id.* at 9. But as in *Bridge*, private plaintiffs may still sue if their injuries are sufficiently *direct*. That is just not the case here.

Indeed, to the extent that Empire's argument sounds familiar, it is because we took a very similar position in *City of New York v. Smokes-Spirits.com, Inc.*, 541 F.3d 425 (2d Cir. 2008). *See id.* at 443 ("Although the State may also seek to sue to vindicate the law, the City should not have to rely on the State to enforce the RICO laws, where the City's injury in the form of lost taxes is no less direct than any comparable injury of the State."). But the Supreme Court then reversed us in

29

*Hemi*, holding that, no matter how the plaintiff characterized the injury, the State was still "better situated" to sue. *See* 559 U.S. at 12 (plurality opinion). Likewise, the dissent in *Anza* argued that New York State's direct injury should not preclude a competitor from also bringing suit, but the majority rejected this view. *Compare Anza*, 547 U.S. at 469 (Thomas, *J.,* concurring in part and dissenting in part) (criticizing the majority for holding that New York's status as "a direct victim" precluded the plaintiff corporation from asserting that it was as well), *with id.* at 460 (majority opinion) ("If the [plaintiff's] allegations are true, [New York] can be expected to pursue appropriate remedies. . . . There is [therefore] no need to broaden the universe of actionable harms to permit RICO suits by [private] parties who have been injured only indirectly."). Accordingly, Empire did not adequately allege proximate cause for its RICO claim predicated on wire fraud.

## D

Empire argues in the alternative that the district court should have granted it to leave to amend so that it could "supplement[] its complaint with additional factual allegations . . . highlighting the direct link . . . between the [smuggling] and Empire's injuries" and "rebutting the district court's unfavorable inferences." Pl.-

Appellant Br. 57. But it "already had one opportunity to amend [its] complaint," and its opening brief "identified no additional facts or legal theories . . . [it] might assert if given leave to amend" that would alter our proximate cause analysis. *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 188 (2d Cir. 2014). Indeed, none of its proposed additions speak to the *directness* of its theory of harm. In short, the district court did not err in denying leave to amend. *See In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 163 (2d Cir. 2016) (affirming the district court's denial of leave to amend because the "alleged injuries [were] too remote").

### III

Empire also appeals from the district court's dismissal of its RICO conspiracy claim and its RICO claim, as predicated on mail fraud, money laundering, and violations of the Travel Act. But Empire's theory of causation for each of these predicates is the same as that for its wire fraud–based RICO claim: the mail fraud, money laundering, and Travel Act violations helped the defendants smuggle liquor to New York, which in turn caused Empire to lose sales. We therefore conclude that Empire failed adequately to allege that these

predicate acts of racketeering proximately caused its injuries for the same reasons explained above.[14]

## CONCLUSION

For the foregoing reasons, we AFFIRM.

---

[14] As we affirm the district court's dismissal on proximate cause grounds, we do not reach Reliable's or LTT's alternative arguments in support of affirmance.