*MSP v. Hereford*

## In the
## United States Court of Appeals
### For the Second Circuit

August Term, 2022

(Argued: September 27, 2022     Decided: April 19, 2023)

Docket No. 22-80

MSP RECOVERY CLAIMS, SERIES LLC, A DELAWARE ENTITY,

*Plaintiff-Appellant,*

–v.–

HEREFORD INSURANCE COMPANY, A NEW YORK COMPANY,

*Defendant-Appellee.*

B e f o r e :

CHIN, CARNEY, and BIANCO, *Circuit Judges.*

Plaintiff-Appellant MSP Recovery Claims, Series LLC, appeals from a judgment of the United States District Court for the Southern District of New York (Ramos, *J.*) dismissing for lack of standing its putative class action against Defendant-Appellee Hereford Insurance Company and denying leave to amend. *MSP Recovery Claims, Series LLC v. Hereford Ins. Co.*, No. 20-cv-4776, 2022 WL 118387 (S.D.N.Y. Jan. 11, 2022). On *de novo* review, we conclude that MSP lacks standing because its allegations do not support an inference that it has suffered a cognizable injury or that the injury it claims is traceable to Hereford. We also conclude that the district court did not abuse its

discretion when it denied MSP leave to amend based on MSP's repeated failures to cure. Accordingly, we affirm the judgment of the district court.

AFFIRMED.

––––––––––––

FRANCESCO ZINCONE (Jorge A. Mestre, *on the brief*), Rivero Mestre LLP, New York, NY, *for Plaintiff-Appellant*.

MICHAEL F. PERLEY, Hurwitz & Fine, P.C., Buffalo, NY, *for Defendant-Appellee*.

––––––––––––

CARNEY, *Circuit Judge*:

This appeal stems from one of numerous lawsuits that MSP Recovery Claims, Series LLC ("MSP"), has brought around the country seeking to recover from insurance companies that allegedly owe payments to Medicare Advantage Organizations ("MAOs") under the Medicare Secondary Payer Act (the "MSP Act"). In the putative class action brought here, MSP charges Hereford Insurance Company ("Hereford") with "deliberate and systematic avoidance" of Hereford's reimbursement obligations under the MSP Act. Jt. App'x 33 (Am. Compl. ¶ 7). The district court dismissed MSP's amended complaint for lack of standing and denied further leave to amend. *MSP Recovery Claims, Series LLC v. Hereford Ins. Co.*, No. 20-cv-4776, 2022 WL 118387 (S.D.N.Y. Jan. 11, 2022). MSP now challenges that ruling.

On *de novo* review, we conclude that MSP does not have standing under Article III because it has failed to establish either injury-in-fact or causation. We also conclude that the district court did not abuse its discretion in denying MSP leave to amend based on its repeated failures to cure. Accordingly, we AFFIRM the judgment of the district court.

2

## I. Statutory Background

### A. The Medicare Secondary Payer Act

Medicare is a government health insurance program that provides coverage for individuals who are 65 or older and for those who have certain disabilities. In 1965, when Medicare was first launched, it "acted as the first payer for many medical services, regardless of whether a Medicare beneficiary was also covered under another insurance plan." *Marietta Mem'l Hosp. Emp. Health Benefit Plan v. DaVita Inc.*, 142 S. Ct. 1968, 1971 (2022). In 1980, however, in part because of the program's rising costs, Congress enacted the MSP Act, restructuring Medicare's relationship with private insurers of Medicare beneficiaries. *See* Medicare and Medicaid Amendments of 1980, § 953, 94 Stat. 2647 (codified as amended at 42 U.S.C. § 1395y). In the MSP Act's current iteration, Medicare is a "secondary payer" for certain medical services in relation to a beneficiary's private insurance plan, which the MSP Act refers to as the "primary plan."[1] *See* 42 U.S.C. § 1395y(b)(2)(A); *see also* Medicare and Medicaid Amendments of 1981, § 2146, 95 Stat. 800. The primary plan typically has a duty to pay first on covered claims. In this way, the MSP Act transformed Medicare into "a back-up insurance plan to cover that which is not paid for by a primary insurance plan." *Aetna Life Ins. Co. v. Big Y Foods, Inc.*, 52 F.4th 66, 69 (2d Cir. 2022) (internal quotation marks omitted).

The MSP Act thus provides that Medicare may not pay, in the first instance, for medical services received by a Medicare beneficiary when "payment has been made or

---

[1] Medicare remains the primary payer, however, for certain beneficiaries, including, for example, those who are not concurrently covered by other insurance plans. *See Medicare Secondary Payer*, Ctrs. for Medicare & Medicaid (Dec. 1, 2021), https://www.cms.gov/Medicare/Coordination-of-Benefits-and-Recovery/Coordination-of-Benefits-and-Recovery-Overview/Medicare-Secondary-Payer/Medicare-Secondary-Payer.

can reasonably be expected to be made" by a "primary plan." 42 U.S.C. § 1395y(b)(2)(A). For these purposes, the term "primary plan" means a group or large group health plan, a workers' compensation law or plan, an automobile or liability insurance policy or plan, or no-fault insurance. *See id.*

When a primary plan "has not made or cannot reasonably be expected to make payment" for a particular service "promptly," however, Medicare may make a conditional payment for the medical service in anticipation of being reimbursed by the primary plan. *Id.* § 1395y(b)(2)(B)(i) ("Authority to make conditional payment").[2] Medicare is permitted to pay first in these limited circumstances so that beneficiaries need not pay for their medical services out-of-pocket and depend on reimbursement by the primary plan. The MSP Act makes Medicare's payment "conditional," however, because the primary plan may ultimately be responsible for the payment. When Medicare has made such a conditional payment and "it is [later] demonstrated that [a] primary plan has or had a responsibility to make payment with respect to such item or service," the primary plan—or the individual or entity that has already received payment from the primary plan—must reimburse Medicare. *Id.* § 1395y(b)(2)(B)(ii) ("Repayment required").[3]

Finally, the MSP Act establishes a private cause of action for double damages "in the case of a primary plan which fails to provide for primary payment (or appropriate reimbursement)" in accordance with the statute. *Id.* § 1395y(b)(3)(A).

---

[2] The applicable regulation defines "promptly" as within 120 days after a primary plan receives the claim. 42 C.F.R. § 411.21.

[3] In certain limited circumstances, the individual Medicare beneficiary may be determined to be primarily responsible for payment, but those circumstances are relevant here only as described further below.

B.    The Medicare Advantage Program

The Medicare Advantage ("MA") Program, established in 1997 by the addition of Part C of Medicare, permits Medicare beneficiaries to choose to receive their health care benefits from certain private insurers called Medicare Advantage Organizations, instead of directly from the federal government.[4] 42 U.S.C. §§ 1395w-21 to -29; *see also Aetna*, 52 F.4th at 70. The MA Program is designed to "allow [Medicare] beneficiaries to have access to a wide array of private health plan choices in addition to traditional fee-for-service Medicare" and to "enable the Medicare program to utilize innovations that have helped the private market contain costs and expand health care delivery options." H.R. Rep. No. 105-217, at 585 (1997).

Under Medicare Part C, MAOs contract individually with the Centers for Medicare and Medicaid Services ("CMS") within the Department of Health and Human Services for CMS to pay the MAO a fixed amount for each Medicare beneficiary who enrolls with the MAO, and for the MAO, in return, to provide at least the same benefits and services that the enrollee would receive under Medicare. *See* 42 U.S.C. § 1395w-22(a). Increasingly since the debut of the MA Program, Medicare beneficiaries have elected to receive their Medicare benefits through MAOs.[5]

---

[4] Part C was enacted as "Medicare+Choice" but was renamed "Medicare Advantage" in 2003. *See* Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. 108-173, § 201(b), 117 Stat. 2066; *see also First Med. Health Plan, Inc. v. Vega-Ramos*, 479 F.3d 46, 48 n.1 (1st Cir. 2007); *Do Sung Uhm v. Humana, Inc.*, 620 F.3d 1134, 1148 n.19 (9th Cir. 2010).

[5] As of March 2023, over 31 million individuals had elected to enroll with an MAO, substantially more than the 6.5 million who had enrolled by July 2006. *See Monthly Contract and Enrollment Summary Report*, Ctrs. for Medicare & Medicaid Servs., https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/MCRAdvPartDEnrolData/Monthly-Contract-and-Enrollment-Summary-Report (last visited Mar. 20, 2023); *see also Aetna*, 52 F.4th at 70.

The MA Program imports many MSP Act provisions into the MAO context. As relevant here, the MA Program adopts the MSP Act's secondary payer regime. *See* 42 U.S.C. § 1395w-22(a)(4). In the MAO context, the MAO (instead of Medicare) is the secondary payer. If a primary plan "has not made or cannot reasonably be expected to make" prompt payment, the MAO may conditionally pay for the enrollee's medical services in expectation of reimbursement by the primary payer. *Id.* § 1395y(b)(2)(B)(i); *see also id.* § 1395w-22(a)(4). When a primary plan is ultimately determined to be responsible for a cost but fails to reimburse an MAO for the MAO's conditional payment, the MAO may sue the primary plan for damages under the MSP Act's private cause of action. *Aetna*, 52 F.4th at 73–75; *see also* 42 U.S.C. § 1395y(b)(3)(A).

C.      The Section 111 Reporting Requirement

In a provision often known simply as Section 111,[6] the MSP Act requires that primary plans report to CMS certain claims they receive so that CMS may "make an appropriate determination concerning coordination of benefits, including any applicable recovery claim." 42 U.S.C. § 1395y(b)(8)(B)(ii). If a primary plan violates Section 111, it is exposed to liability for "a civil money penalty of up to $1,000 for each day of noncompliance with respect to each claim." *Id.* § 1395y(b)(8)(E)(i).

---

[6] Because 42 U.S.C. § 1395y(b)(8) was added into the MSP Act by Section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007, it is often referred to as "Section 111." The parties have done so in their briefing, and we do so here.

Section 111 provides in relevant part:

**(8) Required submission of information by or on behalf of liability insurance (including self-insurance), no fault insurance, and workers' compensation laws and plans**

(A) . . . [A]n applicable plan shall—

(i) determine whether a claimant (including an individual whose claim is unresolved) is entitled to benefits under the program under this subchapter on any basis; and

(ii) if the claimant is determined to be so entitled, submit the information described in subparagraph (B) with respect to the claimant to the Secretary in a form and manner (including frequency) specified by the Secretary.

(B) Required information . . . —

(i) the identity of the claimant for which the determination under subparagraph (A) was made; and

(ii) such other information as the Secretary shall specify in order to enable the Secretary to make an appropriate determination concerning coordination of benefits, including any applicable recovery claim.

. . .

(C) Timing

Information shall be submitted under subparagraph (A)(ii) within a time specified by the Secretary after the claim is resolved through a settlement, judgment, award,

or other payment (regardless of whether or not there is a determination or admission of liability).

. . .

(G) . . .

    (i) . . . The Secretary may share information collected under this paragraph as necessary for purposes of the proper coordination of benefits.

## II.    Factual Background

As alleged in the amended complaint, the facts are as follows.[7]

Hereford provides no-fault insurance to its policyholders. When a policyholder is a Medicare beneficiary, Hereford's no-fault policy is a primary plan under the MSP Act. MSP is a litigation and technology firm that "own[s] and pursu[es] claims" arising under government healthcare programs on behalf of healthcare organizations and providers, including MAOs. Jt. App'x 66. MSP is not itself an MAO, but its assignors are.[8] Health Insurance Plan of Greater New York, an EmblemHealth company ("EmblemHealth") and an MAO, is alleged to be one of MSP's assignors.

MSP seeks double damages in this putative class action for what it describes as Hereford's "deliberate and systematic avoidance of payment and/or reimbursement obligations" under the MSP Act. *Id.* at 33 (Am. Compl. ¶ 7). It contends that Hereford failed to reimburse EmblemHealth and the proposed class of MAOs for conditional

---

[7] Except for its conclusory allegations, which do not bind us, for present purposes we accept as true all of the complaint's factual allegations and draw all reasonable inferences in favor of MSP as plaintiff. *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56–57 (2d Cir. 2016); *see also Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995).

[8] Specifically, MSP alleges that the MAOs for which it brings this action have assigned certain recovery and reimbursement rights to MSP's Series LLCs and that the Series LLCs have, in turn, assigned these rights to MSP. Jt. App'x 39–41 (Am. Compl. ¶¶ 35–38).

payments made by the MAOs for medical expenses incurred by Medicare beneficiaries enrolled with the MAOs and that Hereford, as the primary plan, was required to pay under its no-fault insurance policies.

MSP now identifies only one set of facts that it asserts exemplifies this "deliberate and systematic avoidance": that of the Medicare beneficiary "N.G."[9] It alleges that on October 14, 2014, N.G. was injured in an accident and required medical care as a result. At the time of the accident, N.G. was enrolled in an MA plan issued by the MAO EmblemHealth. N.G. was also covered by a no-fault policy issued by Hereford. For medical services provided to N.G. between October 14 and October 18, EmblemHealth was billed $9,085.15 and paid $2,694.15. Hereford reported N.G.'s medical services to CMS under Section 111. By reporting these services to CMS, MSP alleges, Hereford admitted "that it should have paid for N.G.'s accident-related injuries in the first instance." *Id.* at 43 (Am. Compl. ¶¶ 54–55). To date, Hereford has not reimbursed EmblemHealth for the amounts EmblemHealth paid.

MSP seeks to recover expenses associated with not only the medical services that N.G. received, but also amounts associated with the 63 claims listed in Exhibit A of its Amended Complaint—medical services that Medicare beneficiaries who enrolled with EmblemHealth as their MAO allegedly incurred, that EmblemHealth paid, and that Hereford reported to CMS under Section 111. MSP's double-damages claim also extends to costs for claims that it extrapolates on behalf of a putative class of all MAOs (and their assignees) that paid for a Medicare beneficiary's accident-related medical

---

[9] MSP's amended complaint describes two exemplar claims: those of Medicare beneficiaries identified for privacy purposes as "N.G." and "A.B." Jt. App'x 42–44 (Am. Compl. ¶¶ 47–65). In its opposition to Hereford's motion to dismiss, MSP gave notice that it would not proceed with its A.B. claim. *MSP Recovery Claims*, 2022 WL 118387, at *3 n.4.

services from March 2015 to March 2021 and for which Hereford, as the primary plan, should have reimbursed the MAOs or paid in the first instance.

### III.    Procedural History

MSP sued Hereford in June 2020. After Hereford moved to dismiss, MSP amended its complaint. Hereford again moved to dismiss for lack of subject matter jurisdiction, *see* Fed. R. Civ. P. 12(b)(1), and for failure to state a claim, *see* Fed. R. Civ. P. 12(b)(6). The district court granted Hereford's motion, concluding that MSP did not have standing to bring its N.G., Exhibit A, or class claims. *MSP Recovery Claims*, 2022 WL 118387, at *1.

As to standing, the district court ruled first that MSP failed adequately to plead injury. In the district court's view, MSP alleged that EmblemHealth paid and was not reimbursed for N.G.'s medical expenses, but MSP failed to allege that these payments were *reimbursable* to EmblemHealth. *Id.* at *6–7, 9. The court rejected MSP's argument that when Hereford reported these expenses to CMS under Section 111, Hereford in effect admitted that it, not EmblemHealth, bore primarily responsibility for paying for N.G.'s medical expenses. *Id.* at *7.

Turning to causation, the court reasoned that although MSP alleged that N.G. has a no-fault insurance policy with Hereford and that the policy covered certain of N.G.'s medical expenses, MSP did not plausibly allege that the particular medical services for which EmblemHealth paid were for injuries covered by N.G.'s policy. *Id.* at *9.[10] In other words, the court ruled, even if EmblemHealth suffered a financial injury of

---

[10] In concluding that MSP failed adequately to allege causation, the district court also relied on the Affidavit of Samuel Rubin, submitted by Hereford in support of its Rule 12(b)(1) motion. *MSP Recovery Claims*, 2022 WL 118387, at *9–10. A Rule 12(b)(1) motion challenging subject matter jurisdiction can be either facial, i.e., "based solely on the allegations of the complaint and exhibits attached to it," or fact-based, i.e., after considering evidence beyond the pleadings first offered by the defendant then offered by the plaintiff. *Carter*, 822 F.3d at 56–57. Because we

some kind when it paid for N.G.'s medical expenses, MSP failed to adequately allege that any such injury was fairly traceable to Hereford. *Id.* at *11. The district court concluded, for substantially the same reasons, that MSP failed to establish its standing to assert either its Exhibit A or class-wide claims. *Id.*

Finally, the district court declined to grant MSP further leave to amend its complaint. *Id.* It explained that MSP had already amended its complaint once. It also highlighted the substantially similar cases that MSP has filed across the country and reasoned from the reception accorded many of those cases that MSP was "on notice from the outset that the issue of standing would be front and center." *Id.* (quoting *MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*, No. 17-cv-1537, 2019 WL 6311987, at *9 (C.D. Ill. Nov. 25, 2019), *aff'd*, 994 F.3d 869 (7th Cir. 2021)). Observing that leave to amend may be "properly denied for 'repeated failure to cure deficiencies,'" the court rejected MSP's request. *Id.* at *11–12 (quoting *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008)).

MSP timely appealed.

## DISCUSSION

We review *de novo* a district court's grant of a motion to dismiss. *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56–57 (2d Cir. 2016).

## I.   Standing

Article III, Section 2 of the United States Constitution authorizes federal courts to adjudicate "Cases" or "Controversies," a grant of broad but circumscribed authority. U.S. Const. art. III, § 2. A plaintiff's standing to pursue a claim is "an essential and

---

conclude that MSP's complaint was facially insufficient to show standing, we need not address the fact-based challenge, which relied in part on this Affidavit.

unchanging" element of the bedrock cases-or-controversy requirement. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

Constitutional standing has three elements: (1) *injury-in-fact*, i.e., "an invasion of a legally protected interest [that] is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical," (2) *causation*, i.e., "a causal connection between the injury and the conduct complained of," and (3) *redressability*, i.e., "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 560–61 (internal quotation marks omitted). The party invoking federal jurisdiction—here, MSP—bears the burden of establishing all three elements. *Id.* at 561.

In some cases, a plaintiff may adequately allege injury-in-fact but not the requisite causal link. In other cases, the opposite may be true. Here, however, MSP's theories of injury-in-fact and causation are closely related: both rest on the premise that when a primary plan reports a claim to CMS under Section 111, it admits its own liability for the claim.

MSP alleges that: (1) EmblemHealth, an MAO and MSP's assignor, paid for certain medical expenses incurred by N.G.; (2) when those expenses were incurred, N.G. was insured by a no-fault policy issued by Hereford; (3) Hereford reported to CMS that N.G. received these medical services, and, by doing so, admitted that Hereford was primarily responsible for those costs; and (4) Hereford did not reimburse EmblemHealth. Appellant's Br. 19 (discussing injury), 39–40 (discussing causation) (both quoting Jt. App'x 42–43 (Am. Compl. ¶¶ 47–55)).[11]

_____

[11] MSP advises that it has constructed and uses its own special system to identify claims for which Hereford allegedly "failed to honor its primary payer responsibility." Jt. App'x 36 (Am. Compl. ¶ 20). MSP says that its system:

12

Regarding injury-in-fact, MSP contends that EmblemHealth suffered economic injury because as a secondary payer it paid—but "was not supposed to" pay—for N.G.'s medical expenses, rendering its payment reimbursable under the MSP Act. *Id.* at 19. As to causation, MSP asserts that its injury as payer is fairly traceable to Hereford because, in light of N.G.'s no-fault policy with Hereford, Hereford—not EmblemHealth—was "supposed to" pay for N.G.'s medical services. Both theories rely on the notion that, when Hereford reported information about N.G.'s medical services to CMS under Section 111, Hereford conceded that it, and not EmblemHealth, was responsible as primary payer. Inseparable from that concession, it alleges that Hereford was responsible for reimbursing EmblemHealth, which had made a conditional payment under the MSP Act in relation to N.G.'s services. Jt. App'x 43 (Am. Compl. ¶ 55). EmblemHealth therefore had a cognizable loss, and that loss was demonstrably caused by Hereford, according to MSP.

Other than the damage and causation-related inferences that it urges based on Hereford's Section 111 report, MSP has provided no basis for concluding either that EmblemHealth was denied reimbursement to which it was entitled (that is, that it suffered an economic injury), or that Hereford owed MSP that reimbursement (that is,

---

matches the health care claims data from its Assignors to the publicly available reporting data from CMS and police crash reports available in limited jurisdictions, as well as the claims data made available by primary payers like Defendant, either voluntarily through a coordination of benefits process or by judicial compulsion in a data matching process that has proven successful in identifying primary payers' wrongdoing, to automate the process of identifying instances in which primary payers like Defendant fail to honor their obligations under the MSP [Act].

*Id.* at 33 (Am. Compl. ¶ 9). It continues, "Plaintiff's Assignors and the Class Members have each suffered an injury-in-fact as a result of Defendant's failure to meet its statutory payment and reimbursement obligations." *Id.* at 33–34 (Am. Compl. ¶ 10).

that any economic injury EmblemHealth suffered is traceable to Hereford). Thus, as pleaded, injury-in-fact and causation rise and fall together. A plaintiff's showing of injury-in-fact and of causation for that injury need not always be interdependent in cases regarding reimbursement obligations under the MSP Act, of course. We conclude that they are in this case only because MSP alleges that it made payments that were reimbursable specifically by Hereford, and the only fact it alleges to justify that its payments were both reimbursable generally and reimbursable by Hereford in particular was that Hereford reported the claims to CMS under Section 111. In sum, if MSP has adequately alleged injury, it has adequately established causation. We thus consider the two issues together and turn to the pivotal interpretive question: what does reporting under Section 111 entail and signify?

In MSP's view, whenever a primary plan reports a claim to CMS under Section 111, it admits liability for the claim because Section 111 imposes "a clear and unambiguous" duty on primary plans to report medical services received by Medicare beneficiaries. Appellant's Br. 30. MSP points out that subsection (A) of section 1395y(b)(8) expressly provides that a primary plan's reporting requirement is triggered only by the determination that a claimant for coverage is a Medicare beneficiary. In addition, subsection (C) requires a primary plan to report to CMS only "after the claim is resolved." 42 U.S.C. § 1395y(b)(8)(C). MSP thus advances the theory that, by reporting N.G.'s claim to CMS, Hereford demonstrated its knowledge that N.G. was a Medicare beneficiary; therefore, Hereford must also have known that it was the primary payer with respect to coverage for the specific medical services reportedly provided to N.G.

MSP points to commentary on Section 111 published in the CMS User Guide on Section 111 (the "User Guide") as adopting its interpretation.[12] As understood by MSP, the User Guide "requires no-fault and liability insurers to report their 'ongoing responsibility for medicals,'" a reporting responsibility that "arises after the primary payer 'exercise[s] due diligence' and determines its responsibility to pay for a Medicare beneficiary's medical expenses." Appellant's Br. 33 (quoting CMS User Guide: Chapter III, at 6-10) (alteration in original).[13] Requiring a primary plan to report simply because a Medicare beneficiary has submitted a claim to that plan, MSP suggests, "would cause Medicare to waste taxpayer money prematurely, chasing unreimbursed conditional payments that never become secondary, because a liability insurer was not responsible as a primary payer." *Id.* at 33–34.

For the reasons set forth below, we disagree. Hereford's contrary analysis, paralleling that adopted by the district court, is more faithful to the text of the statute and the purposes of the reporting program.

When interpreting a statute, we begin, as always, "by giving effect to the plain meaning of the text—and, if that text is unambiguous, our analysis usually ends there as well." *Williams v. MTA Bus Co.*, 44 F.4th 115, 127 (2d Cir. 2022) (internal quotation

---

[12] The 2023 version of the User Guide is published at: https://www.cms.gov/Medicare/Coordination-of-Benefits-and-Recovery/Mandatory-Insurer-Reporting-For-Non-Group-Health-Plans/NGHP-User-Guide/NGHP-User-Guide. MSP's brief cites the 2021 version. We are aware of no substantive difference in the relevant text. The document's full title is "MMSEA Section 111 Medicare Secondary Payer Mandatory Reporting; Liability Insurance (Including Self-Insurance), No-Fault Insurance, and Workers' Compensation User Guide." Chapters I and III are titled "Introduction and Overview" and "Policy Guidance" respectively.

[13] Although MSP purports to quote from the User Guide, on our read, the phrase "exercise[s] due diligence" does not appear anywhere in Chapter III.

15

marks omitted). "Plain meaning draws on the specific context in which that language is used." *Id.* (internal quotation marks omitted). If, upon examination, the text is ambiguous, we look to traditional canons of statutory construction, the broader statutory context, and the provision's history to help resolve the ambiguity. *Id.*

Upon examination, we conclude that the text of Section 111 is not ambiguous and that a report filed under its provisions does not amount to an admission of liability. Section 111 provides that, if a no-fault insurer determines that "a claimant (including an individual whose claim is unresolved) is entitled to benefits under [the MSP Act] on any basis," it must "submit[]" certain information specified by the statute to CMS "within a time specified by the Secretary after the claim is resolved through settlement, judgment, award, or other payment (*regardless of whether or not there is a determination or admission of liability*)." 42 U.S.C. § 1395y(b)(8)(A)(i), (C) (emphasis added).

We agree with MSP that, when a primary plan correctly reports a claim under Section 111, the report evidences the plan's determination that the claimant is entitled to benefits under the MSP Act. *See id.* § 1395y(b)(8)(A). But the triggering determination is that the claimant is entitled to benefits "on any basis." "On any basis" can mean benefits to be paid by a primary plan, by Medicare itself, by an MAO, or by another source: all such payments may be obligations owed "under" the MSP Act. Moreover, as highlighted above, Section 111 requires the MAO to submit the specified information "*regardless* of whether or not there is a determination or admission of liability." A standard contemporary dictionary defines "regardless" as "[w]ithout taking account of" or "irrespective of." *Regardless*, Oxford Eng. Dictionary, https://www.oed.com/view/Entry/161197. When used in subsection (C) of section 1395y(b)(8) to modify "submit," the word "regardless" signals unmistakably that a primary plan must report claims covered by the MSP Act without considering its liability for those claims: claims for which it is liable and claims for which it is not liable,

16

alike, must be reported. MSP's proposed construction would render the words "regardless of whether or not there is a determination or admission of liability" superfluous because there would be no circumstance when a primary plan is not liable for a claim it reports. In sum, we reject MSP's reading and conclude that an insurer's report under Section 111 does not admit the insurer's liability for the claim reported.[14]

The statutory scheme reinforces the correctness of this interpretation. *See Catskill Mountains Chapter of Trout Unlimited, Inc. v. Env't Prot. Agency*, 846 F.3d 492, 513 (2d Cir. 2017) ("A statutory provision's plain meaning may be understood by looking to the statutory scheme as a whole and placing the particular provision within the context of that statute." (internal quotation marks omitted)). Section 111 requires primary plans to report more than the claims they are responsible for and fewer than all the claims they receive. For example, they need not report claims made by individuals covered under a no-fault policy but who, because of their youth (for instance), are ineligible for Medicare. But, as noted above, they must report claims made by individuals who may be eligible for coverage under the MSP Act "on any basis," even if the plan is ultimately not responsible for paying for those claims. 42 U.S.C. § 1395y(b)(8)(A)(i).[15]

The MSP Act establishes steep penalties for failures to report and for untimely reporting. The violator may be assessed a penalty of "up to $1,000 for each day of noncompliance with respect to each claimant." *Id.* § 1395y(b)(8)(E)(i). These penalties align with the notion that Section 111 incentivizes over-reporting and early reporting, to

---

[14] We note that, as reflected in the record in this case, insurers regularly report large volumes of claims for coverage of medical services. In addition, although MSP focuses on the phrase "after the claim is resolved," *see* Reply Br. 2 (quoting 42 U.S.C § 1395y(b)(8)(C)); Appellant's Br. 32, this language bears on only timing—not liability.

[15] A primary plan's reporting obligation is further limited by date restrictions and payment amount thresholds, neither of which is at issue here. *See* User Guide, Chapter III, at 6-19.

further the purposes of the reporting requirement more generally: "to enable the Secretary to make an appropriate determination concerning coordination of benefits, including *any applicable recovery claim*." *Id.* § 1395y(b)(8)(B)(ii) (emphasis added); *see also id.* § 1395y(b)(8)(G) (noting that the collected information may be shared "as necessary" for "the proper coordination of benefits"). A "recovery claim" is a claim initiated by CMS seeking reimbursement from a primary plan or from any entity that has received a primary payment for conditional payments CMS has made. *See* 42 C.F.R. § 411.24(b).[16] The highlighted language—"any applicable recovery claims"—reinforces the notion that a "recovery claim" is a mere subset of the claims that a primary plan must report, not all, as MSP contends. To coordinate benefit payments, Medicare logically needs data about *any* claims that it may have to pay, i.e., any claims made by Medicare beneficiaries.

The CMS User Guide, cited by MSP for the contrary position, when properly used, confirms the construction that we adopt. The User Guide explains that primary plans must report any claims made by a Medicare beneficiary "for both Medicare claims processing and for MSP [Act] recovery actions, *where applicable*." User Guide: Chapter I, at 6-1 (emphasis added); *see also* User Guide: Chapter III, at 4-1 (explaining that the data from reporting is used to process "claims billed to Medicare for reimbursement" and "for MSP [Act] recovery efforts, *as appropriate*" (emphasis added)), 5-1 (explaining that the data from reporting is used "to enable an appropriate determination concerning coordination of benefits, including *any applicable* recovery claim" (emphasis added)), 6-22 (explaining that primary plans "must report settlements, judgments, awards, or other payments *regardless of whether or not there is an admission or determination of liability*"

---

[16] *See Attorney Services*, Ctrs. for Medicare & Medicaid (Dec. 1, 2021), https://www.cms.gov/Medicare/Coordination-of-Benefits-and-Recovery/Attorney-Services/Attorney-Services.

and "with either partial or full resolution of a claim" (emphasis in original)). The limiting phrases italicized above reflect an acknowledgment that data collected from Section 111 reporting is not intended to establish the liability of any prospective payer. In other words, a primary plan like Hereford is responsible for reporting any claim received by it that to its knowledge involves a Medicare beneficiary—not just the claims it should have paid as a primary payer or for which it may have to reimburse another payer. CMS acknowledges that the breadth of the reporting responsibility imposed by Section 111 is informed by its purpose not only to "help[] CMS determine primary versus secondary payer responsibility," but also "to enable CMS to pay appropriately for Medicare covered items and services furnished to Medicare beneficiaries." User Guide: Chapter I, at 6-1; *see also* 42 U.S.C. § 1395y(b)(8)(G) (explaining that reporting is necessary for "the proper coordination of benefits").[17] To allow Medicare to coordinate benefits correctly, then, it is essential for Medicare to be advised not only that it is entitled to seek reimbursement from a primary plan but also that it may have to pay a claim in whole or in part without contribution from the primary plan.

MSP's gloss on the CMS commentary is unpersuasive. As described above, it advances the view that the User Guide resolves any interpretive ambiguity in favor of finding that an insurer's Section 111 report admits liability because the User Guide requires certain primary plans to report their "ongoing responsibility for medicals." Appellant's Br. 33. "Such a report," it argues, "demonstrates the primary payer's 'responsibility to pay, on an ongoing basis, for the injured party's (Medicare beneficiary's) medicals associated with the claim.'" *Id.* (quoting User Guide: Chapter III,

---

[17] As to the portions for which the no-fault insurance provider is not liable, "Medicare pays first, but only pays for the Medicare-covered services." *How Medicare Works with Other Insurance*, Medicare, https://www.medicare.gov/supplements-other-insurance/how-medicare-works-with-other-insurance. The claimant is responsible for the rest. *Id.*

at 6-10). The language relied on by MSP, however, does no more than define the phrase "ongoing responsibility for medicals." *See* User Guide: Chapter III, at 6-10; *see also id.* at 2-2. When read in context, the User Guide makes clear that "ongoing responsibility for medicals" is merely one of several types of claim liabilities that primary plans must report.[18] This strengthens our conclusion that Section 111 reporting does not admit liability.[19]

In sum, the plain language of Section 111 tells us that when a no-fault insurance provider such as Hereford reports a claim pursuant to Section 111, it does not thereby admit that it is liable for the claim. The statutory context of the section's reporting obligation and the purpose of the reporting obligation confirm the correctness of this interpretation. Because MSP's argument that the payments made by EmblemHealth are reimbursable by Hereford rests entirely on its proposed interpretation of Section 111, MSP has not adequately alleged a "concrete" or "actual" injury or that the injury it alleges is fairly traceable to Hereford. It therefore lacks standing to bring the N.G. exemplar claim. Accordingly, it also lacks standing to bring its Exhibit A and class

---

[18] In full, the User Guide explains that "ongoing responsibility for medicals" refers to "the [responsible reporting entities'] responsibility to pay, on an ongoing basis, for the injured party's (the Medicare beneficiary's) medicals associated with the claim. This often applies to no-fault and workers' compensation claims, but may occur in some circumstances with liability insurance (including self-insurance)." User Guide, Chapter III, at 6-10; *see id.* at 2-2 (using the same language in the context of defining "ongoing responsibility for medicals").

[19] We recognize that our interpretation of Section 111 is in tension with the result reached by the Eleventh Circuit in *MSP Recovery Claims, Series LLC v. ACE American Insurance Co.*, 974 F.3d 1305 (11th Cir. 2020). In *ACE*, the Eleventh Circuit reasoned that because the MSP Act "obligates insurers like Defendants [primary payers] to report the claims for which they are primary payers," a Section 111 report of a claim demonstrates "Defendants' knowledge that they owed primary payments, including the payments for which Plaintiffs seek reimbursement." *Id.* at 1319. In *ACE*, the interpretive question bore on whether primary plans had "knowledge that they owed a primary payment." *Id.* The court considered this question only in passing, disposing of it in a paragraph with little discussion. *See id.* Respectfully, we are not persuaded.

20

claims, which rely on the same theories of injury and causation.[20] *See* Appellant's Br. 49–52.

## II.    Denial of Leave to Amend

Federal Rule of Civil Procedure 15(a) provides that if a party has already "amend[ed] its pleading once as a matter of course," as MSP has here, it "may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(1)–(2). A court should "freely give leave when justice so requires," *id.*, but it may, in its discretion, deny leave to amend "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party," *Bensch v. Est. of Umar*, 2 F.4th 70, 81 (2d Cir. 2021) (internal quotation marks omitted); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962) (noting that "repeated failure to cure deficiencies by amendments previously allowed" can constitute a reason to deny leave to amend). We generally review a district court's denial of leave to amend for abuse of discretion. *Empire Merchs., LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 139 (2d Cir. 2018); *see, e.g., United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 28–29 (2d Cir. 2016) (reviewing denial of leave to amend due to "repeated failure to cure" for abuse of discretion). If, however, "the denial was based on an interpretation of law, such as futility," we review *de novo* that legal conclusion. *Empire Merchs.*, 902 F.3d at 139 (citation omitted).

---

[20] In its opening brief, MSP argues that when Hereford reported N.G.'s claims, it "admi[tted] that it should have paid for" these claims. *See* Appellant's Br. 19 (quoting Jt. App'x 43 ¶ 55). In its reply brief, MSP belatedly attempts to recast its argument and insists that it argues only that "Section 111 reporting is an admission that Hereford is a primary-payer," and not that "Section 111 reporting is . . . an admission of liability." Reply Br. 3. Even if we understand MSP's argument to be the revised version it furthers in its reply brief, it fails. The mere fact that Hereford is "a" primary payer is insufficient to establish injury-in-fact to the MAO or causation because this fact tells us nothing about Hereford's obligation to pay for the specific medical expenses that N.G. incurred and for which EmblemHealth paid.

In denying MSP's request for further leave to amend, the district court cited MSP's "repeated failure to cure." *MSP Recovery Claims*, 2022 WL 118387, at *11–12 (quoting *Ruotolo*, 514 F.3d at 191). We identify no abuse of discretion in the district court's conclusion.[21]

MSP has brought numerous lawsuits against insurance companies across the country to collect funds allegedly owed to MAOs under the MSP Act. District courts in this Circuit have seen at least seventeen such suits on their dockets and as of this writing have dismissed five for lack of standing. *See Hereford*, 2022 WL 118387, at *12; *MSP Recovery Claims, Series LLC v. AIG Prop. Cas. Co.*, No. 20-cv-2102, 2021 WL 1164091, at *1 (S.D.N.Y. Mar. 26, 2021); *MSP Recovery Claims, Series LLC v. Tech. Ins. Co.*, No. 18-cv-8036, 2020 WL 91540, at *3–4 (S.D.N.Y. Jan. 8, 2020); *MSP Recovery Claims, Series LLC v. N.Y. Cent. Mut. Fire Ins. Co.*, No. 19-cv-211, 2019 WL 4222654, at *5–6 (N.D.N.Y. Sept. 5, 2019); *MSP Recovery Claims, Series LLC v. Hartford Fin. Servs. Grp.*, No. 20-cv-305, 2022 WL 3585782, at *1 (D. Conn. Aug. 22, 2022). The complaints in each of these dismissed cases are substantially similar and yet MSP has made no meaningful efforts of which we

---

[21] We disagree with MSP that the district court denied leave to amend based on futility. Although one sentence in its decision referenced futility, the full sentence states: "Because the Plaintiff has had *plenty of trial runs and has already amended its complaint against these Defendants once*, the Court declines to grant leave to amend again as it would be futile." *MSP Recovery Claims*, 2022 WL 118387, at *12 (emphasis added) (quoting *MSP Recovery Claims, Series LLC v. AIG Prop. Cas. Co.*, No. 20-cv-2102, 2021 WL 1164091, at *15 (S.D.N.Y. Mar. 26, 2021)). Reading this language in context, coupled with the knowledge that this language quotes *AIG*, a similar case involving MSP that was dismissed based on failure to adequately allege standing, we understand the district court to have denied leave to amend based fundamentally on MSP's repeated failures to cure. Even if we accept that the district court denied leave on both bases, we need not—and decline to—address futility; rather, we affirm the district court's denial based on MSP's repeated failure to cure. *See, e.g., Banco Safra S.A.-Cayman Islands Branch v. Samarco Mineracao S.A.*, 849 F. App'x 289, 295–96 & n.5 (2d Cir. 2021) (summary order).

are aware to amend its standing allegations either in the complaint or the amended complaint filed in this case.

In these circumstances, we can see no reason to find any abuse of discretion in the district court's denial of leave to amend. *See Denny v. Barber*, 576 F.2d 465, 471 (2d Cir. 1978) (affirming the district court's denial of leave to amend because the appellant was not "unaware of the deficiencies in his complaint when he first amended it" and was "on the plainest notice of what was required" to avoid dismissal); *see also City of Pontiac Policeman's & Fireman's Ret. Sys. v. UBS AG*, 752 F.3d 173, 188 (2d Cir. 2014) (upholding leave to amend because "it is unlikely that the deficiencies" to the amended complaint "were unforeseen by plaintiffs when they amended" and because "plaintiffs have identified no additional facts or legal theories—either on appeal or to the District Court—they might assert if given leave to amend").

MSP's argument that, without an explicit opportunity to amend, the district court's "order was a de facto dismissal with prejudice" has no merit. Appellant's Br. 52. A dismissal for lack of jurisdiction is by its nature a dismissal without prejudice: it "does not preclude another action on the same claims." *Harty v. W. Point Realty, Inc.*, 28 F.4th 435, 445 (2d Cir. 2022) (internal quotation marks omitted). In contrast, "a dismissal with prejudice is 'a ruling on the merits' that precludes a plaintiff 'from relitigating—in any court, ever again—any claim encompassed by the suit.'" *Id.* (quoting *MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*, 935 F.3d 573, 581 (7th Cir. 2019)).

The district court committed no error in denying leave to amend.

## CONCLUSION

For the reasons stated above, we AFFIRM the district court's judgment of dismissal.